UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JUAN PACHECO, ROCIO JARQUIN,
and JORGE GONZALEZ-DELGADO,

        Plaintiffs,

v.

BOAR'S HEAD PROVISIONS CO., INC.,
a Florida corporation,

        Defendant.
                                        /

File No. 1:09-CV-298

HON. ROBERT HOLMES BELL

## **O P I N I O N**

This matter is before the Court on Plaintiffs' motion for collective action certification and court-approved notice. (Dkt. Nos. 14, 53.)  The Court held an evidentiary hearing on the motion on September 11, 2009.  For the reasons that follow, Plaintiffs' motion will be denied.

### I.

Plaintiffs Juan Pacheco, Rocio Jarquin, and Jorge Gonzalez Delgado, former employees of Defendant Boar's Head Provisions Co., Inc., filed this action on behalf of all former, current, and future employees of Defendant Boar's Head Provisions Co., Inc. ("Boar's Head"), complaining that Defendant engaged in a pattern or practice of unlawful conduct at its plant in Holland, Michigan, which resulted in the violation of their rights under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, or, alternatively, the Michigan

Minimum Wage Law (MMWL), Mich. Comp. Laws § 408.3824 *et seq*. (Dkt. No. 1, Compl. ¶ 1.) The focus of Plaintiffs' complaint is their allegation that Defendant failed to compensate them for time spent donning and doffing required personal protective equipment at the beginning of their shift and before and after their lunch break. Since the commencement of this action nine additional individuals have opted into the action by filing consents to sue. (Dkt. Nos. 16, 18, 55, 59, 64.)

In the motion currently before the Court Plaintiffs move for: (1) certification of a collective action for unpaid overtime wages under the FLSA; (2) an order directing Defendant to provide the names, addresses, telephone numbers, social security numbers, and dates of birth of the class members; and (3) court-supervised notice to the class members. Plaintiffs have defined the proposed FLSA class as:

> All non exempt hourly workers employed by Boar's Head Provisions Co., Inc., Holland Michigan plant at any time during the last three years who were required to don and doff protective gear in the performance of their work.

(Dkt. No. 53, Pls.' Br. at 4.)

## II.

The FLSA authorizes workers to sue collectively on behalf of themselves and others "similarly situated" for violations of the minimum wage and overtime protections of the FLSA. 29 U.S.C. § 216(b). Similarly situated employees who wish to join the action must opt into the class. *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 583 (6th Cir. 2009). In actions brought under § 216(b) a district court has discretion to facilitate notice to potential plaintiffs. *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169, 171 (1989).

The FLSA does not indicate how or when a court should determine whether to certify a collective action or to authorize notice to potential class members. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). Many courts follow a two-stage certification process to determine whether the opt-in plaintiffs and lead plaintiffs are similarly situated. *O'Brien,* 575 F.3d at 583. At the initial stage, these courts typically apply a fairly lenient standard for determining whether the plaintiffs are similarly situated, based solely on the pleadings and any affidavits that have been filed. *Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). They simply require the plaintiffs to show that there is a reasonable basis for their claim of class-wide discrimination. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996); *see also Thiessen*, 267 F.3d at 1102-03 (noting that the district court made an initial notice stage determination based on nothing more than substantial allegations that the class members were similarly situated); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995) (noting that at the notice stage, the court makes a determination on whether to conditionally certify the class for purposes of notice, based only on the pleadings and affidavits, and using a fairly lenient standard). If the court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." *Id.* at 1214. At the close of discovery, these courts typically make a second determination, using a more rigorous standard, as to whether the lead plaintiffs and opt-in plaintiffs are similarly situated, and whether the class should be decertified. *Id.* The standard applied at the second stage considers a variety of factors, including the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs

3

may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action. *O'Brien*, 575 F.3d at 584.

The potential class in this case consists of between 800 and 900 employees. The Court is mindful that it has "a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991); *see also Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."). The Court accordingly opted to allow the parties to engage in two months of discovery on the certification issue before holding a hearing on the issue of certification and notice.

Because the Court has not followed the common two-stage certification process, the question arises as to what standard of review the Court should apply in determining whether the named and opt-in plaintiffs are "similarly situated." Plaintiffs contend that, because they had a limited period of discovery and were not able to send notice to the proposed class or to take discovery from all of the potential plaintiffs, the Court should apply the fairly lenient standard for determining whether they are similarly situated and should not consider potential defenses or manageability. Defendants, on the other hand, contend that because the parties have engaged in discovery specifically directed to the issue of certification, the Court should apply the more rigorous standard, and should consider all pertinent issues including the

employment setting, the available defenses, and the manageability of a collective action.

Where the plaintiffs have been afforded discovery on the issue of whether or not the action should proceed as a collective action, courts typically apply a more restrictive, but still lenient standard, requiring the plaintiffs to demonstrate at least "modest" factual support for the class allegations in their complaint. *See Jimenez v. Lakeside Pic-N-Pac, LLC*, Case No. 1:06-CV-456, 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007); *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 548 n.1 (E.D. Mich. 2004) (citing *Pritchard v. Dent Wizard Intern. Corp.*, 210 F.R.D. 591, 596 (S.D. Ohio 2002)). Although the period of discovery in this case was limited, discovery was focused solely on the issue of certification, and the parties have had an ample opportunity to obtain substantial information about Defendant's policies and procedures and Plaintiffs' claims. There is a sufficient evidentiary record to determine whether this action can be managed on a collective basis. The Court will accordingly base its certification determination on the evidence rather than the pleadings. The Court will consider whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound case management, a manageable class exists. *Olivo*, 374 F. Supp. 2d at 548 (citing cases).

This brings the Court to the question of what it means to be similarly situated. The FLSA does not define the term "similarly situated," *O'Brien*, 575 F.3d at 584. There is no question that "plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Id.* at 585. However, the Sixth Circuit has also observed

5

that even when proof of a violation as to one particular plaintiff does not prove that the defendant violated any other plaintiff's rights under the FLSA, the plaintiffs may nevertheless be similarly situated when their claims are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.*

Although *O'Brien* suggested that FLSA plaintiffs do not have to show a "unified policy" of violations in order to be found to be similarly situated, 575 F.3d at 584, this statement is dicta and is not binding on this Court because *O'Brien* ultimately affirmed the district court's decision to decertify the collective action on other grounds. *Id.* at 587. Moreover, *O'Brien* relied solely on *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996), an ADEA case, in support of this statement, *O'Brien*, 575 F.3d at 584, and did not explain its failure to follow cases decided subsequent to *Grayson*, that have required evidence of a class-wide discrimination. *See, e.g., Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (holding that while a unified policy, plan, or scheme may not be required, the plaintiff must still demonstrate class-wide discrimination).

In the FLSA context, even though the proofs as to any one plaintiff may be individualized and distinct, courts have consistently required the plaintiffs to show that the class members were together the victims of "a single decision, policy, or plan" before they will certify a collective action. *See, e.g., Olivo*, 374 F. Supp. 2d at 548 (noting that prior to discovery, the plaintiff must make a modest factual showing that they and the potential plaintiffs were "victims of a common policy or plan that violated the law"); *Clarke v.*

*Convergys Customer Mgmt. Group, Inc.*, 370 F. Supp. 2d 601, 605 (S.D. Tex. 2005) (holding that notice is only appropriate when there is "some factual nexus which binds the named plaintiffs and potential class members together as victims of a particular alleged [policy or practice]"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409-10 (W.D. Pa. 2000) (requiring the plaintiffs to produce "substantial evidence" of a "single decision, policy or plan"); *Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107, 2009 WL 130069, at *1 (D. Minn. Jan. 20, 2009) (noting that to receive certification as a class, employees must "come forward with evidence establishing a colorable basis for their claim that the putative class members were together the victims of a single decision, policy, or plan"); *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (holding that to be similarly situated, there must be "a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice"). Whether the employees were impacted by a "single decision, policy, or plan" has been described as a "particularly relevant factor" for certification purposes. *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790, 813 (M.D. Tenn. 2008).

In the case before this Court, Plaintiffs have asserted that they were victims of a common policy or plan: they claim that Defendant has a uniform practice of not paying its hourly employees for time spent donning their protective equipment at the start of the shift and donning and doffing their protective equipment before and after their lunch break.[1]

---

[1] Plaintiffs have withdrawn their argument that they were not paid for the time spent doffing their protective equipment at the end of the shift.

Notwithstanding this claim, Plaintiffs acknowledge that Defendant has a written policy, the purpose of which is to formalize and clarify its practice of "ensuring that hourly employees are compensated for time spent donning & doffing unique protective gear, that is integral and indispensable to the employee's primary duties, as well as for time walking to and from their workstations after donning or prior to doffing their protective gear." (Pls.' Ex. 3, April 16, 2007 Michigan Protective Gear and Walking time Pay Policy (Policy No. 0101.20).)[2] The Boar's Head policy regarding donning and doffing protective equipment provides:

> The company has defined the start of the workday as the time when an employee begins to "don," or put on, his or her protective equipment. Therefore, employees should not begin to put on their protective equipment until the beginning of their scheduled shift.

(*Id.*). The policy specifies "dress periods" for each department after the start of the shift, based on time studies conducted by the human resources department. (*Id.*) Employees are paid from the time their shift starts,[3] until they punch out.

Plaintiffs concede that Defendant's plant-wide written policy does in fact require payment for all donning and doffing time and that the policy as written fully complies with the law. (Pls.' Br. 1.) Because the company's written policy clearly requires that employees be paid for donning and doffing time, the Court cannot simply accept Plaintiffs' allegation

---

[2] In this opinion, numbered exhibits refer to exhibits attached to Plaintiffs' brief and reply brief in support of their second motion to proceed as a collective action, (Dkt. Nos. 53, 58), and lettered exhibits refer to exhibits attached to Defendant's response and reply briefs, (Dkt. Nos. 54, 57.)

[3] Employees are paid from the start of the scheduled work shift, rather than from the time they punch in. (Def.'s Ex. F, Boar's Head Memo; Ex. M, Elenbaas Dep. 69.)

that there is a common or uniform practice of **not** paying employees for donning and doffing time. Thus, in order to determine whether this case is suited for resolution as a collective action, the Court must review the evidence to determine whether there is a factual basis for Plaintiffs' claim that Defendant's common or uniform practice was to not follow its formal, written policy.

Plaintiffs' case is premised on their assertion that there was a disconnect between the written policy and what happens in practice. Plaintiffs contend that it was the common and uniform practice for supervisors not to follow the written policy. According to Plaintiffs, "every hourly worker" was denied compensable time due to an "across-the-board break-down" in the policy for ensuring that workers were provided time during their shift to don and doff protective equipment. (Pls.' Br. 3.)

Plaintiffs have offered no direct evidence that management instituted a policy to ignore the written policy. Instead, Plaintiffs rely on circumstantial evidence to suggest that management condoned the practice of ignoring the written policy. In support of this assertion Plaintiffs have offered affidavits from the eleven plaintiffs and opt-in plaintiffs asserting that their supervisors required them to do exactly the opposite of the written policy. They assert that they have not been compensated for all of the time they spent donning and doffing their protective equipment because they were required to don their protective equipment and to be at their designated work fully dressed by the start of their scheduled shift, and that they were only allowed thirty minutes for their lunch break, without taking into consideration the time needed for doffing and donning their protective equipment. (*See, e.g.*,

9

Pls.' Exs. 4, 5, Aff. of Pls. and Opt-In Pls.) The policy of paying for time spent donning and doffing protective equipment was disseminated through oral discussion and training sessions between managers and workers and through the employee handbook. (Elenbaas Dep. 92-95, 98, 113-14 ; Jarquin Dep. 179). The policy was printed and explained in both English and Spanish. (Jarquin Dep. 174-75.)

There is no evidence that supervisors were simultaneously trained, advised, or encouraged **not** to follow the written policy. Nor is there any evidence that management was aware that the written policy was being violated by some supervisors. If, as Plaintiffs assert, Boar's Head has a uniform practice of not paying its production employees for donning and doffing activities after assuring the production employees in written corporate policies that they would be paid for such activities, the Court would expect to see evidence that complaints were made to management about this practice. There is simply no evidence in this case that a single complaint of a violation of the written policy was ever made to anyone outside of the employee's particular department. Plaintiff Pacheco stated in his affidavit that he reported pay discrepancies, but only to his immediate supervisor. He never took it further than that. (Pacheco Aff. ¶ 15; Pacheco Dep. 43, 168.) The other named and opt-in plaintiffs uniformly testified that they never complained that they were not being paid a proper amount of overtime, or that their supervisor's practices policies break were inconsistent with company policy. (*See*, *e.g.*, Jarquin Dep. 173, 230; Delgado Dep. 150; Batlle Dep. 215-16; Cintra Dep. 46-50; Lopez Dep. 162-63.) The absence of complaints is noteworthy because the Plaintiffs are not timid or voiceless employees. At one time Pacheco was a representative

10

on the town hall committee where he met with management to discuss problems or concerns in the department. (Pacheco Dep. 171-73.) Plaintiff Jarquin was a team leader in the boxing department. (Jarquin Dep. 56.) Yet, there is no evidence that any of the named or opt-in Plaintiffs ever raised the issue of not being paid for time spent donning and doffing to anyone outside of their particular department.

The Boar's Head plant is a meat processing plant that employs over 530 production workers in 23 departments on three shifts. (Pls.' Ex. 11.) Each department has different requirements for protective equipment. For example, employees in packaging don gowns, sleeves, and rubber gloves, while employees in beef trim don cut resistant gloves, cut resistant arm guards, plastic sleeves, belly guards, rubber gloves, thick reusable aprons, safety glasses and scabbards. (Pls.' Ex. 12.) Some of the protective equipment is required and some is optional. Some of the protective equipment is stored in the employees' lockers, some is picked up in the laundry area, and some is picked up at the work station. (Elenbaas Dep 155-59, 170). Each department has different lunch breaks, different exercise policies, and different walking distances to break rooms and locker rooms. How each department operates is governed or influenced in large part by the individual supervisor on duty. Even within a single department, the supervisor's enforcement of the written policy may differ from one day to the next.

The named and opt-in Plaintiffs do not purport to represent all of the departments or all of the shifts. They simply assert in identical generic language in their affidavits that they "know of many other individuals with whom I worked alongside and spoke with before,

during and after work who were also required to put on and take off their protective clothing and equipment and who were also not properly compensated for all the hours they worked." (Pacheco Aff. ¶ 16, Jarquin Aff. ¶ 15, Delgado Aff. ¶ 15; Lopez Aff. ¶ 15, Batlle Aff. ¶ 15, Cintras Aff. ¶ 15). Plaintiff Pacheco testified that he worked under two supervisors, one of whom followed the written donning and doffing policy and one of whom did not. (Pacheco Dep. 144-45.) He did not know whether other supervisors followed the written donning and doffing policy. (Pacheco Dep. 145.) Plaintiff Jarquin acknowledged that she had no idea how breaks functioned on the raw side of the plant. (Jarquin Dep. 163-64.) Plaintiff Delgado "supposed" that employees in other departments received the same instructions he received, but he did not know. (Delgado Dep. 148.) Clearly, Plaintiffs' testimony as to what happened to other employees in other departments is based on hearsay and speculation. It is not sufficient to demonstrate that potential class members in other departments were similarly situated. *See Landsberg v Acton Enters.*, No. C2-05-500, 2006 WL 3742221, at *3 (S.D. Ohio Dec. 15, 2006) (holding that speculation that other employees working under other supervisors were not properly paid is insufficient to justify notice to the class); *Harris v. Fee Transp. Servs., Inc.*, No. Civ.A.3:05CV0077-P, 2006 WL 1994586, at *4 (N.D. Tex. May 15, 2006) (holding that allegations that simply state that they believe other workers were discriminated against in similar ways do not satisfy § 216(b)).

Defendant has rebutted Plaintiffs' allegations of a uniform, across-the-board company practice of not paying for donning and doffing activities with evidence that many supervisors do follow the written policy and that many employees are paid for donning activities at the

12

start of the shift and for donning and doffing activities before and after the lunch break in accordance with the written policy. (Def.'s Exs. T-W, Decls. of Rebolloso, Sanchez, Vargas, and Alvarado.)

Because there is a company policy in place that complies with FLSA requirements on donning and doffing, the Plaintiffs' allegations of a uniform company practice of not paying for donning and doffing activities rest peculiarly on Plaintiffs' credibility. In this case, all of the named and most of the opt-in Plaintiffs have been disciplined or terminated by the company. (*See, e.g.*, Pacheco Dep. 197-98; Delgado Dep. 12-15; Lopez Dep. 42; Batlle Dep. 234.) In addition, there are numerous inconsistencies between Plaintiffs' affidavits and their deposition testimony. For example, Plaintiff Pacheco swore in his affidavit that he was not paid for "any" of the time involved to sanitize, walk to the work area, exercise, or don protective equipment, that he only got about fifteen minutes of each thirty minute lunch break, that he "never" received full breaks during the day or a full thirty minute lunch break, and that he was "certainly not paid" for the time he spent putting on and removing his protective equipment. (Pacheco Aff. ¶¶ 9, 10, 14.) Yet, in his deposition, Pacheco testified that when he worked in the sanitation department, his supervisor gave the employees a full lunch break. (Pacheco Dep. 144.) He also admitted that even when he worked in the packaging department, his supervisor sometimes allowed employees to don their protective equipment after the start of the shift and allowed additional time during the lunch break for donning and doffing in accordance with the written policy. (Pacheco Dep. 138, 144-46, 242-43, 249-50).

Plaintiff Delgado likewise swore in his affidavit that he "never" received full breaks during the day or a full thirty minute lunch break, and was "certainly not paid" for the time he spent putting on and removing his protective equipment. (Delgado Aff. ¶ 14.) Yet, the sweeping statements in his affidavit were similarly contradicted by his deposition testimony. Delgado testified that he put on his protective equipment in the department after he did his exercises. (Delgado Dep. 89-91.) Because the evidence reflects that the exercises were conducted while he was on the clock, it follows that he also donned his gear while he was on the clock. Although Delgado stated in his affidavit that he had to doff and don his protective equipment during his 30 minutes lunch break, when he described the time he spent on various activities during his lunch break, it added up to approximately 43 minutes rather than the 30 minutes described in his affidavit. (Delgado Dep. 122-23.) The Court is concerned about the contradictions between Plaintiffs' affidavits and their deposition testimony, because they show "the importance of cross-examination of each plaintiff" and suggest "the need for separate mini-trials to resolve each individual's claim." *Hinojos*, 2006 WL 3712944, at *3. As noted in *Hinojos*, "[s]uch a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Id.*

The Court also has concerns about conflicts between the various Plaintiffs insofar as some of the Plaintiffs were themselves responsible for the timing and length of breaks or the documentation of the breaks. For example, in the packaging department, Plaintiff Pacheco was responsible for filling out the work sheets and recording the amount of time people spent

donning and doffing their equipment, exercising, and taking their breaks. His own reports show that employees in his department were allowed time after the start of their shifts to exercise and don their protective equipment, and that they received more than thirty minutes for lunch, to allow time for donning and doffing. (Pacheco Dep. 174-78; Def.'s Ex. G.) As team leaders, Plaintiff Jarquin and opt-in Plaintiff Ruiz had some responsibility for calling breaks and leading the employees back to work. (Jarquin Dep. 227-30; Ruiz Dep. 115.) *See Mathews v. ALC Partner, Inc.*, No. 2:08-CV-10636, 2009 WL 2591497, at *7 (E.D. Mich. Aug. 24, 2009) (conditionally certifying class prior to discovery, but noting that there was a "potentially serious class conflict" because some class members would have to prove that other class members were complicit in requiring them to work unpaid overtime).

This case is readily distinguishable from *Carlson v. Leprino Foods, Co.*, No. 1:05-CV-798, 2006 WL 1851245 (W.D. Mich. June 30, 2006) (Enslen, S.J.), a case from this Court granting conditional certification in an FLSA donning and doffing case. In *Carlson* there was no policy that complied with the FLSA. Rather, there was evidence from a Department of Labor Survey that 100 percent of surveyed respondents believed that they were required to change off the clock, there were memoranda confirming a plant-wide policy of non-payment for donning and doffing, and there was evidence that supervisors at the plant changed time cards to make sure that employees were not compensated for donning and doffing. *Id.* at *3.

This case is also readily distinguishable from *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790 (M.D. Tenn. 2008), where the court certified an FLSA collective action based on alleged

15

donning and doffing violations. In *Jordan*, the plaintiffs were all subject to a common policy. It was undisputed that the employees were required to don and doff their protective equipment before their pay start time, during their thirty minute break time, and after they clocked out. *Id.* at 797. That is not this case.

This case is more similar to *Thompson*, where the court denied conditional certification in an off-the-clock work case. In *Thompson* the court noted that where the plaintiffs were supervised by different individuals, and where the alleged practice of failing to pay overtime was contrary to the defendant's written policy, the "individualized nature" of the plaintiffs' claims made the case "inappropriate for certification." 2009 WL 130069, at *9. As noted in *Thompson*, in order to merit certification, plaintiffs "must submit evidence that the *reason* why they were not compensated for these tasks is not because of human error or a rogue store manager, but because of a corporate decision to ignore [the company's] published policies and refuse to pay" for these activities. *Thompson*, 2009 WL 130069, at *2 (emphasis in original).

In *Gatewood v. Koch Food Indus., LLC*, No. 3:07CV82-KS-MTP (S.D. Miss. Oct. 20, 2009), the district court conditionally certified a collective action brought by employees of a meat processor who claimed that were not properly compensated for donning and doffing time. *Id.* at 2. After discovery, and after 1300 opt-in plaintiffs joined the suit, the court granted the defendant's motion to decertify the class:

> The plaintiffs' testimony makes clear that they, as a class, are not required to wear the same clothing, nor do they follow the same donning and doffing practices. In fact, the plaintiffs admittedly put on different items, at different

16

>times, in different places, all depending on their job duties and their own personal practices and preferences.

*Id.* at 33. But more critical to the court's decertification decision was the fact that the plaintiffs were not subject to a single pay practice. *Id*. "[T]he putative class members have been shown to be subject to a number of differing timekeeping and compensation practices – practices determined by their specific positions, departments, and supervisors." *Id.* at 34. The plaintiffs would have to introduce individualized proof on liability and damages, proof which would be "difficult or impossible to offer on a class-wide basis." *Id.* at 35. The court concluded that "the named plaintiffs were not even similarly situated to each other, much less to the over 1300 opt-in plaintiffs." *Id.* at 35. The court determined that the problems would not be alleviated by creating subclasses: "trying to manage this case during a liability phase with so many variances in compensation, clothing, washing and walking practices would be impossible. It would, of necessity, devolve into dozens of mini-trials on just the liability issue." *Id.* at 37.

Like *Gatewood*, the plaintiffs in the case before this Court "put on different items, at different times, in different places, all depending on their job duties and their own personal practices and preferences." *Id.* at 33. Moreover, because there is a formal policy to pay employees for donning and doffing activities, any failures to follow that policy will be unique to specific departments and supervisors. Unlike *Gatewood*, this Court need not put the parties through the time and expense of conditional certification and notification because discovery on the front end of the case has shown such great disparities in the liability issue

17

alone, that the Court can conclude that this case is not amenable to resolution on a collective basis.

For the reasons stated, the Court will deny Plaintiffs' motion for collective action certification and court-approved notice. (Dkt. Nos. 14, 53.)

An order consistent with this opinion will be entered.


Dated: December 3, 2009                                /s/ Robert Holmes Bell
                                                                      ROBERT HOLMES BELL
                                                                       UNITED STATES DISTRICT JUDGE